# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **FRANTZ BISSERETH & WILLIE MAY RYNER,** | ) ) ) ) |
| **Plaintiffs,** | ) ) |
| **v.** | ) ) |
| **UNITED STATES OF AMERICA,** | ) ) ) |
| **Defendant.** | ) ) |

**CIVIL ACTION
NO. 1:21-11068-TSH**

## ORDER AND MEMORANDUM ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' MOTION TO AMEND (Docket Nos. 104 and 137)

### November 13, 2023

HILLMAN, S.D.J.

The Estate of Frantz Bissereth[1] and Willie May Ryner ("Bissereth" and "Ryner," collectively, "Plaintiffs") bring a suit against the United States of America ("Defendant" or "government") under the Federal Tort Claims Act ("FTCA"), alleging three common law torts[2]—assault and battery, negligence, and intentional infliction of emotional distress—arising from a raid that was authorized for their residence, but directed at their neighbor. The Defendant moves for summary judgment on all claims and the Plaintiffs move to amend their complaint. For the reasons below, the Court ***grants*** in part and ***denies*** in part the government's motion for summary judgment and ***denies*** the Plaintiffs' motion to amend their complaint.

### Background

---

[1] Bissereth passed away during this litigation. (Docket No. 101).
[2] The Plaintiffs also brought *Bivens* claims against the individual officers, on which summary judgment was granted. (Docket No. 89, at 12-19).

The following facts are undisputed except where noted. Legal conclusions are not accepted as facts. *See, e.g.*, (Doc. No. 131, at ¶¶ 49-52).

### 1. The Warrant Application

On June 26, 2019, Joseph Losavio, Jr. ("Losavio"), a Special Agent with the Department of Health and Human Services, Office of Investigations, applied for a search warrant for 105 Brunswick Street, Apartment 2. The government alleges that Losavio had probable cause to believe that the property at 105 Brunswick Street, Apartment 2, contained evidence, fruits, and instrumentalities of False Representation of a Social Security Number, in violation of 42 U.S.C.§ 408(a)(7)(B), and Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A. The Plaintiffs do not contest that Losavio had probable cause to believe that those crimes were being committed by the actual target of the warrant, Juan Jose Heureaux Carmona (Heureaux Carmona). However, they argue that Losavio had multiple documents with different addresses and only one contained the Plaintiffs' exact address. This allegation is supported by Plaintiffs' visual inspection of the records underlying the application for the warrant. Having inspected those records in camera, the Court finds that allegation substantiated. The Court takes judicial notice of the fact that Losavio averred that law enforcement conducted surveillance of 105 Brunswick Street and saw someone resembling Heureaux Carmona leaving the Plaintiffs' building. (19-mj-05243-JGD, Docket No. 1-1, at ¶ 17).

### 2. The Raid

According to the government, on June 27, 2019, John Does 1-9 were Special Agents ("SA") with Homeland Security Investigations ("HSI").[3] John Doe 4 received an email on June

---

[3] Plaintiffs aver they lack the knowledge to affirm or deny this allegation. Because of the lack of discovery, the Court excuses this unusual response. Regardless, the fact is not material, and the Court includes it only to set the stage for the case.

17, 2019, that HSI planned to execute an arrest and search warrant on June 27, 2019, and wanted a "Special Response Team" ("SRT") for the search of 105 Brunswick Street, Apartment 2. The email provided John Doe 4 with the name of the target, the stolen identity, and the target's criminal history. The SRT was justified by the gang and criminal activity in the area and Heureaux Carmona's criminal background.[4] The Search Warrant authorized a search for records, documents, and items referencing Heureaux Carmona and the person whose identity Heureaux Carmona allegedly used. On June 27, nine officers went to 105 Brunswick Street, Apartment 2 to execute the warrant. However, the residents of Apartment 2 were Bissereth and Ryner, not Heureaux Carmona.

At this point, the narratives sharply diverge. On the government's telling, the officers knocked and announced their presence but there was no response. At that point, the officers made the decision to breach the door, but stopped when they heard the occupant trying to open the door from the inside. With the door opened, the officers gave Bissereth verbal commands to come out of the apartment, but Bissereth refused to comply and would not move from the doorway, instead asking what was happening and impeding the officers' entry into the apartment and their ability to see into the apartment. At this point, John Doe 8 tried to pull Bissereth into the hallway, but he resisted. In response, John Doe 8 "pulled him out of the apartment, escorted him to the ground using an arm bar technique, and placed him on the second-floor landing," before John Doe 5 handcuffed him. John Doe 3 entered the apartment, encountered Ryner, and handcuffed her.

---

[4] Plaintiffs dispute this claim, referencing the "search warrant." The application for the search warrant reveals Heureaux Carmona did have a criminal history, or at least that it was reasonable to believe he did. (19-mj-05243-JGD, Docket No. 1-1, at ¶ 12). No reasonable jury could find that the officer did not have a reasonable belief that Mr. Heureaux Carmona had a criminal history.

According to Ryner, neither she nor Bissereth heard knocking or an announcement that the intruders were law enforcement, but were woken up by a severe banging. Bissereth asked who it was and, upon opening the door, "had a police officer point a gun at his head very close to him" and after getting out of bed Ryner "heard [Bissereth] being thrown to the ground." After seeing Bissereth on the ground, an officer pointed a gun at Ryner, told her to go into the hall, and handcuffed her. She further alleges that "neither [Bissereth] nor I did anything to disobey the police officers" but were "yelled at and pushed from place to place while our hands were tied." After some time, Ryner avers that Bissereth, in response to a question by the officers, told them "he lives upstairs" and the officers split up, with some remaining in the downstairs apartment and others going upstairs. At this point, Ryner alleges, "I noticed [Bissereth's] face. He had been punched in the face. His forehead, cheekbones and nose were all bleeding. He told me that he had been punched in the face."[5]

At this point, the narratives (mostly) converge. An officer evaluated Bissereth, applied gauze to his injury, and transferred him to Boston Emergency Medical Service ("Boston EMS"). Boston EMS assessed Bissereth and took his vitals, but he refused transport. While the government describes the extent of Bissereth's injuries as "a small laceration under [his] lip," Plaintiffs have introduced the report of Boston EMS, which described his "lower jaw area [as] swollen and tender," in addition to corroborating the "[m]inor controlled bleeding inside [his] mouth." The Boston EMS report indicates that the "mechanism of injury" for the jaw injury was "unknown." The Plaintiffs also highlight several medical records where Bissereth told medical

---

[5] In their opposition, Plaintiffs represent that Bissereth was "mouthing off to the agents." This is not corroborated by any of the evidence submitted. This Court does not consider unsubstantiated allegations in a summary judgment motion. *Cf. Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Although it is strange for a non-moving party to allege unsubstantiated facts in their brief that *damage* their position, this Court is aware of no doctrine that would allow it to consider unsubstantiated allegations merely because they prejudice, rather than help, the non-moving party.

providers he had been "assaulted" and "punched" by "homeland security," and those records report facial injuries beyond the laceration. (Docket No. 130-2, at 10; Docket No. 131-2, at 14; Docket No. 131-2, at 23). The Court finds that both sides have supplied sufficient evidence to support their alternative narratives. Because, at summary judgment, this Court must make all reasonable inferences in favor of the non-moving party, it credits the Plaintiffs' narrative where it conflicts with the government's.

### Standard of Review

Under Federal Rule of Civil Procedure 56(a), a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." An issue is "genuine" when a reasonable factfinder could resolve it in favor of the nonmoving party. *Morris v. Gov't Dev. Bank of P.R.*, 27 F.3d 746, 748 (1st Cir. 1994). A fact is "material" when it may affect the outcome of the suit. *Id.* When ruling on a motion for summary judgment, "the court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Scanlon v. Dep't of Army*, 277 F.3d 598, 600 (1st Cir. 2002) (citation omitted).

### Analysis

*1. Motion for Summary Judgment for Lack of Subject Matter Jurisdiction*

The government moves for summary judgment on the basis of a lack of subject matter jurisdiction, arguing the alleged conduct does not fall under the FTCA's waiver of sovereign immunity because it is discretionary.

*a. Discretionary Function Exception*

The Discretionary Function Exception ("DFE") to the FTCA's waiver of sovereign immunity shields the United States from tort liability arising from its officers' discretionary acts.

To determine if the DFE applies, the Court must identify the conduct that caused the harm, regardless of the legal claims the plaintiffs bring. *Fothergill v. United States*, 566 F.3d 248, 252-53 (1st Cir. 2009). Then, the Court must determine if any of the courses of conduct were discretionary. That analysis is split into two prongs. In the first prong, plaintiffs must point to a statute, regulation, or policy directs a certain course of action. *Reyes-Colón v. United States*, 974 F.3d 56, 58 (1st Cir. 2020). If the relevant authority either forbids or mandates the alleged conduct the DFE does not apply because the conduct is not discretionary. If the plaintiffs cannot point to a statute, regulation, or policy, they must prevail on the second prong, which asks whether the conduct is susceptible to policy analysis—a weighing of competing policy priorities. *Hajdusek v. United States*, 895 F.3d 146, 150 (1st Cir. 2018).

    i.  *The DFE and the Execution of the Warrant – Negligence*

  In their complaint, the Plaintiffs focus on the *execution* of the search warrant by the officers as the relevant conduct underlying their negligence claim. However, in their opposition to summary judgment, they abandon that theory. As such, it is deemed waived.

    ii.  *The DFE and the Application for the Warrant – Negligence*

  In their opposition to the motion for summary judgment, the Plaintiffs focus on the *application* for the warrant to support their negligence claim—specifically, that information material to probable cause was withheld. Initially, the Plaintiffs suggested they would amend their complaint, though they now seem to argue that the claim was within their complaint all along, as the "gravamen" of their complaint was the unlawfulness of the warrant application. New theories not alleged in a complaint cannot be raised in an opposition to summary judgment. *Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64, 76 (1st Cir. 2016). However, because the new theory is ultimately meritless, the Court assumes it was adequately alleged.

The Plaintiffs allege that Losavio withheld from the magistrate judge the existence of several other addresses associated with Heureaux Carmona and his aliases. In addition, they argue that while the application says there were "[r]ecords from MassHealth" associated with 105 Brunswick Street, Apartment 2, there was only one record associated with that address.[6] The Court has reviewed the materials underlying the application for the warrant and there is no evidence that Losavio had any materials indicating that Heureaux Carmona lived in a different unit within 105 Brunswick Street. Instead, there are records associated with Heureaux Carmona (and his aliases) that contain other addresses. Indeed, there are two addresses that appear repeatedly in the materials, whereas 105 Brunswick Street, Apartment 2 only appears once. The omission of those addresses does not defeat probable cause under the standard in *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978); *see United States v. Tanguay*, 787 F.3d 44, 49 (1st Cir. 2015) (intentional or reckless omissions satisfy the *Franks* standard if "the omitted information, if incorporated into the affidavit, [are] sufficient to vitiate probable cause."). To justify a warrant, there "must have been a fair probability—in other words, a reasonable likelihood—that the agency would find evidence of a crime." *United States v. Gonzalez-Arias*, 946 F.3d 17, 22 (1st Cir. 2019) (citations omitted). "[T]he government need not make a beyond-a-reasonable-doubt or even a more-likely-than-not showing to establish probable cause for a search." *Id.* at 25.

Law enforcement conducted surveillance of 105 Brunswick Street and saw someone resembling Heureaux Carmona leaving the building. (19-mj-05243-JGD, Docket No. 1-1, at ¶ 17). If the Magistrate Judge knew that Heureaux Carmona was associated with various addresses (*including* records associated with 105 Brunswick Street, Apartment 2), and that surveillance had revealed someone resembling Heureaux Carmona was seen exiting 105 Brunswick Street, there

---

[6] The fact that there was a record, rather than "records," also does not materially affect the probable cause analysis.

is probable cause that "evidence, fruits, and instrumentalities" of his alleged crimes would be found at 105 Brunswick Street, Apartment 2 because there is a "fair probability" he resides there, at least some of the time. Furthermore, the affidavit alleged, and the Plaintiffs do not dispute this aspect of it, that "[i]ndividuals often keep identification documents and other evidence of identity in their residence." (19-mj-05243-JGD, Docket No. 1-1, at ¶ 16b). This Court agrees with the Plaintiffs that the fact that Heureaux Carmona was accused of identity theft is relevant insofar as a magistrate judge would not be justified in assuming the validity of the records. But here, the officers conducted surveillance of the building in question and included an averment in their application that such surveillance was conducted.[7] The Plaintiffs also seem to argue that because a majority of the addresses associated with Heureaux Carmona were *not* 105 Brunswick Street, Losavio withheld "current information that Carmona was in a different location." Again, the surveillance is fatal to the Plaintiffs' argument: whether Heureaux Carmona also resided at these other addresses, he was spotted exiting 105 Brunswick Street.

The Plaintiffs argue in a sur-reply that the Constitution required Losavio to confirm that Heureaux Carmona exited Apartment 2, and not one of the other units in the building. That is a different constitutional argument than the *Franks* theory because the magistrate judge knew that Heureaux Carmona was only spotted exiting 105 Brunswick Street, not any specific unit. Rather than arguing that Losavio withheld information relevant to probable cause, the Plaintiffs are arguing that there was not probable cause to issue the warrant given the information in the application. Assuming this distinct theory was adequately pleaded, it fails on the merits. Again, a

---

[7] In passing, Plaintiffs argue that there was "not a single photograph or document" proving this surveillance. In fact, there are several photographs of the building. Plaintiffs cite no case law for the proposition that officers must document, with photographs, their surveillance of a suspect to establish probable cause.

warrant is justified if there was "a fair probability—in other words, a reasonable likelihood—that the agency would find evidence of a crime." *Gonzalez-Arias*, 946 F.3d at 22.

There is a higher quality of evidence linking the suspect to the specific unit here than in *Gonzalez-Arias.* (In which the First Circuit found probable cause).[8] There, the government had reason to believe that a suspect was conducting drug deals in an apartment building and agents "overheard Gonzalez-Arias . . . tell [a food] delivery person to buzz apartment 18." *Id.* at 25. The First Circuit conceded that his presence there did not establish his residence, as he could have been visiting a neighbor. *Id.* But it was enough to establish a "fair probability" that he was ordering food to the apartment where he conducted drug deals. *Id.* Thus, here, there is a "fair probability" that when a person seen walking out of an apartment building has a MassHealth record associated with Apartment 2 of that building, they reside in Apartment 2 of that building, especially considering this building is significantly smaller than the one described in *Gonzalez-Arias*. (19-mj-05243-JGD, Docket No. 1-1, at 8–9) (the photographs of the building show that it is a "triple decker" three-unit apartment common in Boston).

That said, I reiterate the frustration the previous Judge expressed with the government in this case. (Docket No. 35). The government concedes the Plaintiffs were detained and their home ransacked in the course of an investigation of a crime they had nothing to do with. The government has repeatedly attempted to obstruct relevant discovery and undercut on technical grounds the Plaintiffs' colorable, if ultimately meritless, claims related to that search.

### iii.  The DFE and the Assault

---

[8] Plaintiffs also cite to *Maryland v. Garrison*, another case where a mistaken search was *not* held to violate the Fourth Amendment. 480 U.S. 79 (1987).

In their opposition to the motion for summary judgment, the only conduct the Plaintiffs identify for the DFE analysis is the agent's[9] punch. Insofar as their complaint raised assault claims stemming from the handcuffing or detainment of either plaintiff, those claims are waived.

The Plaintiffs argue that ICE's excessive force policy forbids the alleged punch. The government concedes that the use of excessive force is not protected by the DFE and that a punch in this context would likely constitute excessive force. However, this Court has an independent duty to police its jurisdiction. The policy cited by the Plaintiffs restates the constitutional standard for excessive force. (Docket No. 106-19). Therefore, this Court need not decide whether the policy, separate from the constitutional standard, would create a binding policy. *Cf. Evans v. United States*, 876 F.3d 375, 383 (1st Cir. 2017) ("general guidelines" and "aspirational goals" are insufficient to defeat the DFE). Unconstitutional actions fail the first step of the DFE analysis, both in the First Circuit, *Limone v. United States*, 579 F.3d 79, 101-02 (1st Cir. 2009); *Thames Shipyard & Repair Co. v. United States*, 350 F.3d 247, 254 (1st Cir. 2003), and in most circuits, *Loumiet v. United States*, 828 F.3d 935, 943 (D.C. Cir. 2016) (collecting cases). This is because there is no discretion for actors to take unconstitutional actions. If there is a genuine dispute as to whether excessive force was used, then the government may not prevail at summary judgment. *Gill v. United States*, 588 F. Supp. 3d 134, 140 (D. Mass. 2022). Here, such a dispute exists. At the summary judgment stage, the Court makes all reasonable inferences in favor of the non-moving party—the Plaintiffs. With that in mind, the Plaintiffs' affidavit and medical record are sufficient grounds for a reasonable jury to find that an officer punched

---

[9] The Plaintiffs cannot identify the agent, whose identity has not been revealed to them.

Bissereth in the face for, at most, asking who they were. That is a use of excessive force under the circumstances.[10]

When officers execute a search warrant, "they may seize people they find on the premises, but must use reasonable force to effectuate the detention." *Penate v. Sullivan*, 73 F.4th 10, 20 (1st Cir. 2023) (citation omitted). "It is well established that the reasonableness test requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Sánchez v. Foley*, 972 F.3d 1, 13 (1st Cir. 2020) (citation omitted). "An assessment of reasonableness must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *O'Brien v. Town of Bellingham*, 943 F.3d 514, 530–31. (1st Cir. 2019) (citation omitted). Furthermore, "[t]his evaluation must allow for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 531 (citation omitted). Finally, "[The Supreme Court has] three criteria for evaluating the reasonableness of force used: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Ciolino v. Gikas*, 861 F.3d 296, 302 (1st Cir. 2017) (citation omitted).

The crime in question was identity theft, not a violent crime. At the time of the punch, the officers were executing a warrant in what was described as a high crime, high gang activity area.

---

[10] The "Law Enforcement Provision" allows for intentional torts predicated on the actions of law enforcement officers to proceed against the United States under the FTCA. 28 U.S.C. § 2680(h). The government argues that the law enforcement provision does not displace the DFE. The First Circuit has not decided this question, but it is unnecessary to decide here because, assuming the DFE applies to cases involving law enforcement, it does not apply to this case.

Drawing all reasonable inferences in favor of the Plaintiffs, they had not identified themselves as law enforcement. And although officers are given more leeway in chaotic situations, *Ciolino*, 861 F.3d at 304–05, that an area has more crime does not give law enforcement an excuse to use force without some evidence the subject of the force poses some threat to them or others. Here, nothing about Bissereth's question (nor his presence, as a man in his sixties) posed a threat to the officers. Finally, a reasonable jury could credit the Plaintiffs' allegations that they were not resisting the officers. Applying the principles above, it is well established in this district that punching someone who is not resisting arrest or otherwise posing a threat to officer safety constitutes excessive force in violation of the Fourth Amendment. *Masciari v. Town of Belmont*, No. 19-cv-10066-IT, 2020 WL 6586370, at *3 (D. Mass. Nov. 10, 2020); *Goddard v. Kelley*, 629 F. Supp. 2d 115, 124 (D. Mass. 2009); *Stoddard v. Somers*, No. 03-cv-10461-DPW, 2004 WL 2830704, at *8 (D. Mass. Dec. 7, 2004); *United States v. Rullo*, 748 F. Supp. 36, 42–43 (D. Mass. 1990); *cf. Shea v. Porter*, 56 F. Supp. 3d 65, 88 (D. Mass. 2014) (describing "punch[es]" as a prototypical use of excessive force). The Plaintiffs do not present evidence of extensive injuries, but they are more than de minimis. *Bastien v. Goddard*, 279 F.3d 10, 14–16 (1st Cir. 2002).

The government argues that there is no evidence that Bissereth was punched, arguing that Ryner did not see the assault and Bissereth cannot testify as he passed away. However, Ryner testifies that Bissereth told her he was punched while they were both detained. Hearsay cannot be used to defeat a summary judgment motion. *Rivera-Rivera v. Medina & Medina, Inc.*, 898 F.3d 77, 89 (1st Cir. 2018). However, without making a final determination on the admissibility of the testimony, Ryner's testimony might be admissible under Rule 803(2) of the Federal Rules of Evidence. ("A statement relating to a startling event or condition, made while the declarant was

under the stress of excitement that it caused."). Furthermore, as discussed above, Plaintiffs have identified medical records that recount Bissereth stating he had been punched. These are possibly admissible under Rule 803(4) ("A statement that (A) is made for—and is reasonably pertinent to—medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; *their inception*; or their general cause") (emphasis added); *see also* Rule 803(6) (describing the "Records of a Regularly Conducted Activity" hearsay exception). The government also baldly asserts that if one of its officers punched Bissereth, his injuries would have been far greater. This Court cannot credit that sort of assertion at summary judgment, though the government is free to make the argument at trial.

To be clear, if the jury finds the government's narrative more credible, the force was not excessive. In their telling, Bissereth was resisting arrest and creating a credible safety issue for the officers and the officer restrained him. In such a situation, the force was "reasonable . . . to effectuate the detention" and there would be no constitutional violation. *Penate*, 73 F.4th at 20. In the absence of a constitutional violation, the Plaintiffs have identified no statute, regulation, or policy that mandates or forbids a particular course of action because the policy identified simply restates the constitutional standard. In that case, the DFE would apply, and the jury would not consider whether the use of force met the elements of an assault in Massachusetts. But this is a dispute "of whether [an officer] acted a certain way, not to what extent or why he did so." *Stoddard*, 2004 WL 2830704, at *8 (D. Mass. Dec. 7, 2004). It is a fact question for the jury. Because a reasonable jury could find that the officer punched Bissereth without sufficient provocation, and because doing so would be unconstitutional, summary judgment is *denied* on the assault claim. Because substantially the same analysis applies to the IIED claim, summary judgment on that claim is also *denied*.

### 2. *Motion for Summary Judgment on the Merits*

In passing, the government argues that the elements of the underlying torts have not been adequately alleged. This argument has already been rejected. (Docket No. at 89, at 19-22) (in holding that the record was insufficiently developed to rule on whether there was a genuine dispute of material fact regarding these claims, the Court necessarily found that the torts were adequately alleged). The government does not sufficiently develop this argument to permit reconsideration of the Court's prior order. The government also argues, with no explanation, that the Plaintiffs "will not be able to prove" the elements of assault or IIED. That does not meet the modest burden on defendants in summary judgment motions to "inform[] the district court of the basis for its motion, and identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citation omitted).

### 3. *Motion to Amend*

Plaintiffs request to amend their complaint. There is some dispute about the appropriate standard for motions to amend, but under any standard this Court will not allow futile amendments. Motions to amend are futile if the proposed complaint "fails to state a plausible claim for relief." *In re Curran*, 855 F.3d 19, 28 (1st Cir. 2017).

Plaintiffs move to add Section 1983 claims for purported constitutional violations of the Fourth Amendment against Losavio and unknown Massachusetts State Troopers (or possibly other state authorities) for substantially the same reasons they allege the DFE does not apply to the negligence claim. While state officials can be liable for damages caused by constitutional violations, *see generally Hafer v. Melo*, 502 U.S. 21 (1991), federal officials are not subject to

Section 1983, nor are they subject to constitutional torts outside the ever-shrinking scope of *Bivens*. Plaintiffs' novel statutory interpretation—that Losavio was so "entangled" with the state of Massachusetts in his investigation, he became a "state" actor for the purposes of Section 1983—relies on a doctrine that analyzes the relationship between private and public entities, not the relationship between two sovereigns. *Cruz-Arce v. Mgmt. Admin. Servs. Corp.*, 19 F.4th 538, 544 (1st Cir. 2021) (describing the "three general ways in which a private party may become a state actor"). Regardless, both claims fail on the merits. The purported liability of both Losavio and the state troopers (or other state authorities) hinge on a constitutional violation in the warrant application process. For the reasons discussed above with regard to the negligence claim, there was no constitutional violation. Therefore, the motion to amend is *denied*.[11]

## Conclusion

For the reasons above, the Defendant's motion for summary judgment is ***granted*** in part and ***denied*** in part. Summary judgment is ***granted*** as to Plaintiffs' negligence claim and ***denied*** as to Plaintiffs' assault and IIED claims. Plaintiffs' motion to amend is ***denied***.


**SO ORDERED**

*/s/ Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**SENIOR DISTRICT JUDGE**

---

[11] This also renders the Plaintiffs' motion to compel moot, as they have had access to the materials underlying the warrant and none of those materials give rise to a claim.